UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEDRA DE LA ROSA

                Plaintiff,

      - against -

600 BROADWAY PARTNERS, LLC AND
J.M. HOLLISTER, LLC,

                Defendants,

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2016
```

**MEMORANDUM
OPINION & ORDER**

13 Civ. 6390 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Dedra De La Rosa alleges that Defendants 600 Broadway Partners, LLC,

("600 Broadway Partners") and J.M. Hollister ("Hollister") discriminated against her in violation

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the New York State

Executive Law, the New York State Civil Rights Law ("NYSCRL"), and the New York City

Administrative Code.  She claims, inter alia, that she encountered multiple barriers to

accessibility during her visits to Defendants' store, located at 600 Broadway in Manhattan.

        Defendants have moved for summary judgment on all claims.  (Dkt. No. 77)  For

the reasons stated below, Defendants' motion will be granted in part and denied in part.

## BACKGROUND

### I.    FACTS

        In 1973, the New York City Landmarks Preservation Commission (the

"Landmarks Commission") designated an area encompassing 600 Broadway as the "Soho Cast-

Iron Historic District."  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 1)[1]  In late 2007, Hollister began

---

[1] To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements,
it has done so because the opposing party has either not disputed those facts or has not done so

leasing retail space at 600 Broadway.[2] (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 3) Hollister decided

to "rehabilitate" the space prior to opening its store. (Id.) On April 22, 2008, 600 Broadway

Partners obtained a permit from the Landmarks Commission authorizing the following work:

> interior alterations . . . at the subcellar through the third floor levels, including the
> demolition and construction of non-bearing partitions and finishes; the removal of
> sections of floor slabs; the construction of stairs and an elevator shaft; structural
> work, relating to the removal of sections of the floor slabs and construction of
> stairs and [an] elevator shaft; and mechanical and plumbing work.

(Parker Decl. (Dkt. No. 81-2), Ex. G (LPC Permit) at 2)[3] On May 21, 2008, the New York City

Department of Buildings issued a permit authorizing "interior structural work." (Smith Decl.

(Dkt. No. 79-2), Ex. B (Department of Buildings Permit))

Before Hollister took possession of the property, 600 Broadway Partners

"remov[ed] the existing sidewalk, grillage or steel work, and had it refurbished, [or] reinstalled,

with [a] new glass block installed within the steel work." (Smith Dep. (Dkt. No. 79-6) 14:4-21)

As a result of this work, there is a "slight slope on the sidewalk leading up to the entrance, and a

slight elevation change upon entry." (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 21; see also Smith Decl.

(Dkt. No. 79-2) ¶ 9; Mifsud Decl. (Dkt. No. 79-11) ¶ 6) 600 Broadway also has a rear exit, but it

"is not open to the public and is not intended for customer use." (Pltf. R. 56.1 Stmt. (Dkt. No.

---

with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where
Plaintiff disagrees with Defendants' characterizations of the cited evidence, and has presented an
evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.
See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational
factual inferences in non-movant's favor in deciding summary judgment motion).

[2] Pottery Barn had previously operated a store at the same location. (Pltf. R. 56.1 Stmt. (Dkt.
No. 81) ¶ 2; Smith Dep. (Dkt. No. 79-6) 17:22-18:15)

[3] The page numbers of documents referenced in this Order correspond to the page numbers
designated by this District's Electronic Case Filing system.

81) ¶ 47)  "Absent emergency, customers are only permitted to enter and exit through the front door on Broadway Street."  (Id. ¶ 48)

The store has one sales counter, or "cash wrap," that is located on the second floor.  (See Mifsud Decl. (Dkt. No. 79-11) ¶ 5; De La Rosa Dep. (Dkt. No. 81-6) 17:13-20:4)  When Hollister assumed possession of the property, there was an existing historic elevator located near the center of the store.  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 26)  Hollister installed a second, ADA-compliant elevator, which is located toward the back of the store.  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶¶ 37-38)  Hollister designated the new elevator for employee use – specifically, to assist with "bring[ing] merchandise from the stockroom to the sales floor." (Shilling Dep. (Dkt. No. 81-8) 35:22-36:23)  Hollister decided to use the historic elevator as "the primary customer elevator."[4]  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 40)  Since the historic elevator "was not being fully utilized by the previous tenant," Hollister "refurbished [it] and brought it up to code to the fullest extent possible," but that elevator is still "not . . . fully ADA-compliant." (Smith Decl. (Dkt. No. 79-2) ¶ 11)  Because the historic elevator is manually operated, customers require employee assistance to use it.  (See Smith Decl. (Dkt. No. 79-2) ¶ 11; Shilling Dep. (Dkt. No. 81-8) 34:23-35:16)

In July 2008, Hollister opened its store to the public.  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 5)  Between 2010 and 2014, Plaintiff – who resides in New York City (Am. Cmplt. (Dkt. No. 50) ¶ 5) – visited the store on four occasions.  (De La Rosa Dep. (Dkt. No. 81-6) 15:19-16:12, 36:11-19)  During each visit, Plaintiff – who uses a wheelchair – encountered barriers that prevented her from independently navigating the store, including a lack of elevator

---

[4]  At some point in 2015, "Hollister opened the [rear] elevator to use by customers."  (Mifsud Decl. (Dkt. No. 79-11) ¶ 3)

access,[5] and narrow and partially obstructed aisles.  (Id. 17:13-19:2, 21:21-22:24, 33:23-34:17, 37:4-42:6)  Plaintiff was told that there was not "a way for [her] to get up the stairs" to the second floor of the store.  (Id. 19:14-20:4)  She also found it "very difficult to maneuver" through the store.  (Id. 18:7-17)

## II.   ALLEGED DEFICIENCIES

The Complaint was filed on September 11, 2013, and lists thirty-eight "[b]arriers to access that plaintiff encountered and/or which exist at the defendants' place of public accommodation."  (Cmplt. (Dkt. No. 1) ¶ 30)  On December 30, 2014, Plaintiff filed the Amended Complaint, which lists forty-nine barriers to access in Defendants' store.  (Am. Cmplt. (Dkt. No. 50) ¶ 29)

At an April 20, 2015 conference, the Court directed Plaintiff "to submit . . . a very clear statement of what is necessary for the building to come into compliance with the ADA." (Apr. 20, 2015 Conf. Tr. (Dkt. No. 86) 8:6-22)  The Court informed the parties that Plaintiff's statement "will be the backdrop against which the defendants' motion for summary judgment will be measured."  (Id.)

On April 23, 2015, Plaintiff submitted a letter in response to the Court's directive. (See Apr. 23, 2015 Pltf. Ltr. (Dkt. No. 66))  The letter "provide[s] to the Court and the defendants a list of deficiencies and plaintiff's proposed accessibility modifications."  (Id. at 1) Plaintiff identifies eight deficiencies: (1) the front door entrance is inaccessible due to a one-and-a-half-inch "change in elevation (i.e.[,] small step) at the front entrance"; (2) "[t]he ground-floor space in front of the entrance door does not contain a minimum of 60 inches of level

---

[5]  On De La Rosa's fourth visit to the store, she was able to access the second floor using the rear elevator.  (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶¶ 14, 15)

4

perpendicular ground space"; (3) "[t]he ground-floor [e]ast exit has two doors in a series and both doors have steps"; (4) "[t]here is no accessible elevator to transport a disabled customer between the first and second floors"; (5) the store "lacks signage . . . indicating the location of the elevator for use by disabled customers"; (6) "[t]he sales and service counters lack an accessible portion of the counter that is no greater than 36 inches in height and at least 36 inches long"; (7) "[t]he customer path of travel throughout the store is less than 36 inches wide in numerous locations because of merchandise displays, a decorative ladder, and clothing racks"; and (8) accessible dressing rooms lack International Symbol of Accessibility ("ISA") signs. (Id. at 1-3)

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## II.    ELEMENTS OF AN ADA CLAIM

Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C § 12182(a).  "To state a claim under Title III, [Plaintiff] must allege (1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide. Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008).  "A plaintiff can establish discrimination in violation of the ADA by showing that the defendant violated the applicable accessibility standards set forth in the ADA Accessibility Guidelines ('ADAAG')." Lemmons v. Ace Hardware Corp., No. 12-cv-03936-JST, 2014 WL 3107842, at *7 (N.D. Cal. July 3, 2014); see also Shariff v. Beach 90th St. Realty Corp., No. 11-cv-2551 (ENV)(LB), 2013 WL 6835157, at *4 (E.D.N.Y. Dec. 20, 2013) ("The Court looks to the [ADAAG] to determine whether the alleged architectural barriers constitute discrimination under

6

the ADA."). Because there is no dispute here as to the first two elements, this Court's inquiry focuses on the third element.

## III.   **STANDING**

Defendants argue that De La Rosa lacks standing to challenge Alleged Deficiencies 1, 2, 3, 6, and 8, because "De La Rosa never encountered, was not affected by, was not deterred by, and was unaware of [those alleged deficiencies]." (Def. Br. (Dkt. No. 78) at 18) Citing to Plaintiff's deposition, Defendants contend that De La Rosa only "alleges [that] she encountered two barriers – lack of elevator access . . . and tight spaces," and therefore she lacks standing to challenge any other Alleged Deficiencies. (Id. at 17)

### A.   **Applicable Law**

"To satisfy constitutional standing requirements, a plaintiff must prove:  (1) injury in fact, which must be (a) concrete and particularized, and (b) actual or imminent; (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable decision." Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 187 (2d Cir. 2013) Courts applying these requirements "[i]n the ADA context, . . . have previously found standing (and therefore an injury in fact) where (1) the plaintiff alleged past injury under the ADA; (2) it was reasonable to infer that the discriminatory treatment would continue; and (3) it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' [establishment] to plaintiff's home, that plaintiff intended to return to the subject location." Id. at 187-88 (citing Camarillo, 518 F.3d at 158).

In ADA cases, "a 'broad view of constitutional standing' is appropriate because 'private enforcement suits are the primary method of obtaining compliance with the Act.'" Baker v. New York State Dep't of Envtl. Conservation, No. 1:10-CV-1016 (GLS/RFT), 2012

7

WL 2374699, at *2 (N.D.N.Y. June 22, 2012) (quoting <u>Chapman v. Pier 1 Imports (U.S.) Inc.</u>,

631 F.3d 939, 946 (9th Cir. 2011)).

**B.    Analysis**

In <u>Kreisler v. Second Ave. Diner Corp.</u>, the Second Circuit ruled that "once a

plaintiff establishes standing with respect to one barrier in a place of public accommodation, that

plaintiff may bring ADA challenges with respect to all other barriers on the premises that affect

the plaintiff's particular disability." <u>Kreisler</u>, 731 F.3d at 188 (citing <u>Chapman</u>, 631 F.3d at 950-

51; <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 893-94 (8th Cir. 2000)).   The court found that "[t]his

rule comports with and furthers the purpose of the ADA, which . . . is 'not subject to any of the

prudential limitations that apply in other contexts . . . [and] generously confer[s] the right to be

free from disability-based discrimination.'"  <u>Id.</u>  (quoting <u>Fulton v. Goord</u>, 591 F.3d 37, 42 (2d

Cir. 2009)).

Defendants' effort to distinguish <u>Kreisler</u> is not persuasive.  Defendants contend

that, "unlike the <u>Kreisler</u> plaintiff, De La Rosa was not aware of any alleged barriers other than

the alleged elevator and 'tight' path of travel <u>at the time she filed her lawsuit</u>."  (Def. Br. (Dkt.

No. 78) at 16 (emphasis added))  However, <u>Kreisler</u> does not include an "awareness at time of

filing" requirement.  To the contrary, the <u>Kreisler</u> court saw "nothing that would preclude" a

plaintiff from "challeng[ing] ADA violations that he became aware of after the lawsuit's

commencement," "so long as the subsequently-discovered ADA violations relate to the

plaintiff's disability."  <u>Kreisler</u>, 731 F.3d at 188 n.5.

Defendants suggest that <u>Kreisler</u>'s holding is limited to plaintiffs who cannot

enter a store, and therefore are not capable of encountering each barrier within.  (Def. Br. (Dkt.

No. 78) at 17)  This reading flies in the face of the Second Circuit's decision, however, which

8

explicitly rejects such narrow conceptions of ADA standing.  The <u>Kreisler</u> court emphasized that

"'[t]he ADA's remedial scheme is not limited to orders for the removal of encountered barriers,

but instead dictates that "injunctive relief shall include an order to alter facilities to make such

facilities readily accessible to and usable by individuals with disabilities."'" <u>Kreisler</u>, 731 F.3d

at 188-89 (quoting <u>Chapman</u>, 631 F.3d at 951 (quoting 42 U.S.C. § 12188(a)(2))).  The court

also explained that a narrow view of ADA standing – such as that put forward by Defendants

here – "'would burden businesses and other places of accommodation with more ADA litigation,

encourage piecemeal compliance with the ADA, and ultimately thwart the ADA's remedial goals

of eliminating widespread discrimination against the disabled.'" <u>Id.</u> at 189 (quoting <u>Doran v. 7-</u>

<u>Eleven, Inc.</u>, 524 F.3d 1034, 1047 (9th Cir. 2008)).

       Having alleged that she encountered a barrier at Defendants' store,[6] Plaintiff "may

bring ADA challenges with respect to all other barriers on the premises that affect [her]

particular disability." <u>Id.</u> at 188.

## IV.   <u>MOOTNESS</u>

       Defendants contend that "Alleged Deficiencies 1, 4, 5, 6, and 7 are either moot, or

in the process of being rendered moot." (Def. Br. (Dkt. No. 78) at 18)  As such, Defendants

argue that there is no longer a justiciable controversy over which this Court can exercise

---

[6] Defendants' rely on <u>Bernstein v. City of New York</u>, No. 13-CV-04610 (CM)(SN), 2015 U.S.
Dist. LEXIS 18810 (S.D.N.Y. Jan. 7, 2015), <u>report and recommendation adopted</u>, 2015 U.S.
Dist. LEXIS 19023, (S.D.N.Y. Feb. 18, 2015), <u>vacated and remanded</u>, 621 F. App'x 56, 56 (2d
Cir. 2015) – a decision that has been vacated – in arguing that a plaintiff must have personally
encountered each barrier he or she complains of.  (See Def. Br. (Dkt. No. 78) at 17-18; Def.
Reply (Dkt. No. 82) at 7)  In that case, the district court found that the complaint did not plead
facts demonstrating that "[plaintiff] [had] personally encountered <u>any</u> of the barriers." <u>Bernstein</u>,
2015 U.S. Dist. LEXIS 18810, at *25 (emphasis added).  Such is not the case here, where
Defendants concede that Plaintiff encountered certain barriers. (<u>See</u> Def. Reply (Dkt. No. 82) at
8 (arguing that Plaintiff "only encountered two alleged deficiencies"))

jurisdiction. In response, Plaintiffs argue that Defendants' supposed remedial measures "depend[] on future events entirely outside of judicial control," and that "[a]bsent an enforceable judgment, defendants' counsel's vague assurance of future corrections do not moot the action." (Pltf. Br. (Dkt. No. 80) at 8-9)

## A.    **Applicable Law**

Because Article III authority is tied to the adjudication of "Cases" and "Controversies," "courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy." Already, LLC v. Nike, Inc., 133 S. Ct. 721, 726 (2013) (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006)). "A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" Id. at 726-27 (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982)). "An 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" Alvarez v. Smith, 558 U.S. 87, 92 (2009).

"The 'voluntary cessation' exception to the mootness doctrine recognizes, however, that 'a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.'" Gropper v. Fine Arts Hous., Inc., 12 F. Supp. 3d 664, 669 (S.D.N.Y. 2014) (quoting Already, LLC, 133 S. Ct. at 727). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." Already, LLC, 133 S. Ct. at 727. Accordingly, a defendant asserting mootness "'bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" Id.

10

(quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000)).

There is "a two-part test to determine when voluntary cessation may render a case moot: 'if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" Gropper, 12 F. Supp. 3d at 670 (emphasis in original) (quoting Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 110 (2d Cir. 2010)).

"In ADA cases involving architectural barriers remedied by structural changes, some courts have found that the conduct reasonably would not recur because the defendants would have no reason to alter the structural changes back." Scott v. Cash To Go, Inc., No. 6:13-cv-142-Orl-37KRS, 2013 WL 1786640, at *2 n.2 (M.D. Fla. Apr. 26, 2013) (citing Sharp v. Rosa Mexicano, D.C., LLC, 496 F. Supp. 2d 93, 99 (D.D.C. 2007) ("The alleged discrimination cannot reasonably be expected to recur because 'structural modifications . . . are unlikely to be altered in the future.'" (quoting Indep. Living Res. v. Or. Arena Corp., 982 F. Supp. 698, 774 (D. Or. 1997)))). "Such cases can be contrasted with those where ADA non-compliance flows from an easily changeable policy." Id. (citing Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1189 (11th Cir. 2007) ("If we conclude that her claims are moot, then should MRN determine that future litigation is unlikely, it may well calculate that its new policy is no longer the preferable course of action and revert to the old policy it prefers and apparently believes to be legal.")); see also Young v. D.C. Hous. Auth., 31 F. Supp. 3d 90, 97 (D.D.C. 2014) ("'[G]iven the ease with which defendants could stop providing captioning, we simply cannot say that they have made an affirmative showing that the continuation of their alleged ADA violations is

11

"nearly impossible."'" (quoting Feldman v. Pro Football, Inc., 419 F. App'x 381 (4th Cir. 2011))).

Courts also reject mootness challenges where the claimed ADA-corrective changes "consist[] largely of promises that [the defendant] will fulfill in the future." Gropper, 12 F. Supp. 3d at 670 (emphasis in original).

## B. Analysis

### 1. Elevated Front Door Entrance

With regard to Deficiency 1 – the elevated front door entrance – Defendants "ha[ve] initiated communication with the Landmarks Preservation Commission ("LPC") to determine if the LPC will approve of a modified entryway that will eliminate the elevation change." (Mifsud Decl. (Dkt. No. 79-11) ¶ 6) Defendants argue that "[i]f the modification is approved, then the work will be done and Alleged Deficiency 1 will be moot." (Def. Br. (Dkt. No. 78) at 20)

The possibility that this alleged deficiency will be addressed is not sufficient to moot Plaintiff's claims as to this deficiency. There is no timeline for the completion of this project, and absent a ruling Plaintiff would be left to hope that Defendants follow through on their planned remedial measures. Although Defendants claim to have initiated communication with the Landmark Commission concerning a modified entryway, there is no evidence that they have initiated formal proceedings to obtain approval. Moreover, the project is also contingent on New York City Department of Buildings approval. (See Mifsud Decl. (Dkt. No. 79-11) ¶ 6) In Gropper, the court rejected a mootness argument premised on similar facts:

Nobu has promised in the [Voluntary Compliance Agreement ("VCA")] to install an ADA-compliant permanent entrance ramp, but it must first acquire municipal approvals, including from the [Landmarks Commission], which may take time. The VCA does not give a particular timeline by which such approvals must be

12

> gained; Nobu only promises to use its "best efforts" to acquire such approvals. Even if Nobu gains authorization to install the ramp, it may take up to nine months to complete the installation. Thus, . . . Nobu may not resolve its alleged ADA violation for years.

Gropper, 12 F. Supp. 3d at 670.

Here, as in Gropper, Defendants' alleged planned resolution of Deficiency 1 "consists largely of promises that [they] will fulfill in the future," so "it cannot be contended that [Defendants] ha[ve] 'completely and irrevocably eradicated the effects' of the alleged ADA violations." Id. (emphasis in original).

## 2. **Elevator Accessibility**

To attempt to address Deficiencies 4 and 5, both of which concern elevator accessibility, "Hollister opened the second elevator" – "located in the back of the store, near the stockroom" – "to use by customers and is placing signs in the store directing customers to its location." (Mifsud Decl. (Dkt. No. 79-11) ¶ 3) Hollister argues that "[f]ull access to both elevators has 'irrevocably eradicated the effects of the alleged violation.'" (Def. Br. (Dkt. No. 78) at 21 (quoting Bacon v. Walgreen Co., 91 F. Supp. 3d 446, 451 (E.D.N.Y. 2015)))

Hollister's new policy permitting customers to use the rear elevator is not irrevocable. If the Court found these deficiencies moot, nothing would prevent Hollister from reversing its policy the next day. And there is reason for concern that the policy would be reversed. Hollister originally intended that the rear elevator would be used to move employees and freight. (Def. R. 56.1 Stmt. (Dkt. No. 79) ¶ 39) Hollister only implemented the new policy after this action was filed. (Mifsud Decl. (Dkt. No. 79-11) ¶ 3) In short, "the [policy] Defendant[s] put in place here is not the sort of permanent physical change or change that inherently cannot be undone that courts have found to foreclose a reasonable chance of recurrence." Young, 31 F. Supp. 3d at 97.

13

### 3.   **Accessible Sales and Service Counters**

With regard to Deficiency 6, which concerns the accessibility of sales and service

counters, "[o]n August 10, 2015, Hollister modified its cash wrap by installing an accessible

portion." (Petschauer Decl. (Dkt. No. 82-2) ¶ 5)[7]  "The accessible portion is 36 inches long

(wide), and 34 inches high."  (Id.)

The ADAAG requires that "[i]n areas used for transactions where counters have

cash registers and are provided for sales or distribution of goods or services to the public, at least

one [sales counter and at least one service counter] shall have a portion of the counter which is at

least 36 in (915mm) in length with a maximum height of 36 in (915 mm) above the finish floor."

ADAAG § 7.2(1) (2010).  It appears that Hollister has brought its store's sales counter into

compliance with ADA regulations.  Given that modification of the sales counter likely required

some expense, and that there would be no apparent benefit to returning it to its prior state, the

Court concludes that Plaintiff's claim is moot as to the sales counter. See Bacon, 91 F. Supp. 3d

at 452 ("It is undisputed that defendant has remedied the alleged access barrier, and the Court

does not reasonably expect that defendant will move the security sensors to an impermissibly

narrower position."); Kohler v. In-N-Out Burgers, No. CV 12-5054-GHK (JEMx), 2013 WL

---

[7]  The Petschauer declaration was submitted with Defendant's reply brief.  Defendants indicated
in their opening brief that they were in the process of modifying the "cash wrap," however, so
Plaintiff cannot reasonably claim prejudice or unfair surprise.  See Kowalski v.
YellowPages.com, LLC, No. 10 Civ. 7318(PGG), 2012 WL 1097350, at *10 (S.D.N.Y. Mar. 31,
2012) (new declarations submitted with a reply brief "do not 'spring upon' Defendant new
arguments" because "they contain essentially the same assertions found in declarations . . . that
Plaintiffs submitted with their original moving papers"); see also Mifsud Decl. (Dkt. No. 79-11)
¶ 5 ("Currently, Hollister is in the process of modifying the cash wrap by adding a fully-
accessible counter.").

14

5315443, at \*7 (C.D. Cal. Sept. 12, 2013) ("As a result, . . . Defendant has shown that it makes no sense for it to spend more money to revert to non-compliance, especially where there is no evidence that Defendant would derive any benefit from such reversion.").

Plaintiff claims, however, that Defendants' store contains a service counter that does not comply with the ADAAG. (See Apr. 23, 2015 Pltf. Ltr. (Dkt. No. 66) at 2 ("The sales and service counters lack an accessible portion of the counter that is no greater than 36 inches in height and at least 36 inches long." (emphasis added)); Am. Cmplt. (Dkt. No. 50) ¶ 29.XXXII ("Defendants fail to provide that at least one of each type of sales and/or service counter is accessible and dispersed throughout its premises."); Parker Decl. (Dkt. No. 81-2), Ex. A (Pltf. Expert Report) at 6 ("The perfume counter is 42 inches above the finish floor.")) Accordingly, Defendants' summary judgment motion is denied as to Deficiency 6 to the extent that that deficiency addresses the service counter in Defendants' store.

### 4. Narrow Aisles

Defendants argue that Deficiency 7 – which concerns Hollister's alleged failure to maintain a 36-inch wide path of travel – is moot because (1) the store has a policy that "provides for an unobstructed path of travel throughout the store, including 36 inches minimum width"; (2) "when fixtures (e.g., display racks and merchandise tables) were initially installed, Hollister ensured that the 36 inch accessible route standard was met"; and (3) the policy also "requires the fixtures to be velcroed to the floor in a location that complies with the 36 inch requirement." (Def. Br. (Dkt. No. 78) at 21-22)

It appears that Hollister's alleged path of travel policy has been in place since the store's opening in 2008. (Smith Dep. (Dkt. No. 79-6) 69:2-69:7, 72:20-73:10 (noting that Hollister's policy requires "[f]orty-four [inches] for egress, 36 [inches] for access," and that

15

measurements were conducted in "2008, prior to store opening")) Assuming arguendo the existence of a longstanding policy, there is evidence that the policy has not been enforced or actively followed. When asked at her deposition whether Hollister had "any particular policy . . . with regard to aisle spacing," Dena Shilling – who was responsible for "[i]mplementation of training programs" for the store in the fall of 2014 – testified that she did "[n]ot . . . know of" such a policy. (Shilling Dep. (Dkt. No. 79-8) 27:25-28:10, 47:6-12) Shilling later testified that there was a "path of travel policy," but she did not know the policy's requirements, whether the policy is in writing, or whether the store's manager has a copy. (Id. 62:17-64:19, 65:13-65:24) Shilling's only communication with the store's manager regarding the path of travel policy took place the day before her deposition. (Id. 64:20-65:6)

Plaintiff had difficulty navigating the store's allegedly narrow aisles during each of her four visits. (De La Rosa Dep. (Dkt. No. 81-6) 18:7-17, 21:21-22:24, 34:8-36:7, 37:4-41:20) Moreover, during a March 2015 inspection, Defendants' expert identified multiple instances in which the store was out of compliance with respect to the 36-inch access requirement. (See Parker Decl. (Dkt. No. 81-2), Ex. B (Def. Rebuttal Rpt.) at 2-3 (noting clearance widths of 26-1/2, 27 to 30, and 31-1/2 inches at various points in the store)) As a result, Defendants' expert recommended that Hollister "[e]stablish [a] policy and train staff to locate and monitor the placement of displays and merchandise to provide a 36 inch wide minimum accessible route through the area." (Id., Ex. B (Def. Rebuttal Rpt.) at 2-3) Such a recommendation would make no sense if such a policy were already in place. (See Def. Reply (Dkt. No. 82) at 9-10 ("The path of travel policy has always required . . . an unobstructed path of travel throughout the store that complies with the ADA's requirement of 36 inches of minimum width for accessible routes."))

16

The "evidence demonstrates that [Hollister's] policies and procedures were either ineffective in preventing frequent blocking of the aisles or honored in the breach." Chapman v. Pier 1 Imports (U.S.) Inc., 779 F.3d 1001, 1008 (9th Cir. 2015). As such, Plaintiff's claim concerning Deficiency 7 is not moot.

## V.    "BARRIERS" UNDER THE 1991 ADAAG

Defendants argue that Deficiencies 3 and 8 do not qualify as barriers under the 1991 ADAAG. (Def. Br. (Dkt. No. 78) at 23)

As to Deficiency 3 – which concerns the exit located at the rear of the store – Defendants contend that the "exit is not open to the public and not utilized by customers," and that the 1991 ADAAG only requires two accessible means of egress for "new construction." (Id.; see also Mifsud Decl. (Dkt. No. 79-11) ¶ 4 ("The back exit, located on Crosby Street, is not open to the public and [is] not intended for customer use."))

The parties agree that the New York City Building Code requires two emergency exits, but they disagree as to whether each of those exits must be accessible. Defendants contend that "while NYC Admin. Code § 27-366 requires two exits, it does not require that both be accessible." (See Def. Reply (Dkt. No. 82) at 11-12) Plaintiff argues that "a public accommodation is required to have accessible emergency exits if the local building code simply requires emergency exits at the location," and that "the defendants' use of inaccessible emergency exits violates Title III of the ADA as well as the Administrative Code." (Pltf. Br. (Dkt. No. 80) at 30)

Section 4.1.3(9) of the 1991 ADAAG provides that "[i]n buildings or facilities, or portions of buildings or facilities, required to be accessible, accessible means of egress shall be provided in the same number as required for exits by local building/life safety regulations."

17

ADAAG § 4.1.3(9) (1991).  Section 4.1.3(9) only applies to new construction, however.  See id. § 4.1.6(1)(g) ("In alterations, the requirements of 4.1.3(9) . . . do not apply.").  Accordingly, that provision has no application here.[8]

Plaintiff's generalized invocation of Title III is not persuasive.  In promulgating Title III regulations regarding public accommodations, the Department of Justice indicated that emergency egress "is appropriately addressed in [the] ADAAG," and noted that "[the] ADAAG does not require changes to emergency egress areas in alterations."  28 C.F.R. pt. 36, app. C. The Court will not read a requirement into the ADAAG that was consciously omitted.[9]  Because Plaintiff has provided no legal basis on which relief can be granted as to this alleged deficiency, Defendants' motion for summary judgment as to Deficiency 3 will be granted.

As to Deficiency 8 – which concerns the lack of an ISA sign identifying accessible dressing rooms – Defendants argue that neither the ADA nor the applicable New York City Building Code requires such signage.  (Def. Reply (Dkt. No. 82) at 12)  While Plaintiff concedes that "the ADA may not require [] the ISA symbol," she argues that "the NYC Building Code does."  (Pltf. Br. (Dkt. No. 80) at 29)

---

[8]  Access 4 All, Inc. v. Atl. Hotel Condo. Ass'n, Inc., cited by Plaintiff (see Pltf. Br. (Dkt. No. 80) at 29-30), involved a building that qualified as new construction under the ADAAG.  See Access 4 All, No. 04-61740-CIV, 2005 WL 5643878, at *8 (S.D. Fla. Nov. 23, 2005) ("The ADAAG are particularly required to be followed for new construction, such as the building at issue in this case.").

[9]  Plaintiff's case authority (see Pltf. Br. (Dkt. No. 80) at 30) is likewise unpersuasive.  In Savage v. City Place Ltd. P'ship, Maryland's Circuit Court utilized Title III in evaluating the validity of an alleged discriminatory "written evacuation policy" – means of egress requirements were not at issue.  Savage, No. 240306, 2004 WL 3045404, at *3-4 (Md. Cir. Ct. Dec. 20, 2004). Plaintiff's other citation is to a consent decree that makes no mention of Title III.  Disabled Patriots of Am., Inc. v. S & S Realty Ltd., No. 1:05 CV 2496-CAB, 2006 WL 1473114, at *6 (N.D. Ohio May 28, 2006).

Section 1110.1(8) of the 2008 Building Code requires ISA signage for

"[a]ccessible dressing, fitting and locker rooms where not all such rooms are accessible."

N.Y.C. Admin. Code § 1110.1(8) (2008). However, the parties agree that Hollister obtained a

work permit to rehabilitate the 600 Broadway space on May 21, 2008. (Def. R. 56.1 Stmt. (Dkt.

No. 79) ¶ 4; Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 4) Because the effective date of the 2008

Building Code is July 1, 2008, the 1968 Building Code applies. See N.Y.C. Department of

Buildings, 2008 Construction Codes Effective Dates,

http://www1.nyc.gov/site/buildings/codes/2008-construction-codes-effective-dates.page (last

visited March 29, 2016) (providing that the effective date of the 2008 Building Code is July 1,

2008). The 1968 Building Code does not require ISA signage. Accordingly, Defendants motion

is granted as to Deficiency 8.[10]

## VI.   WHETHER – UNDER THE ADA – THE "ALTERATIONS STANDARD" OR THE "READILY ACHIEVABLE STANDARD" APPLIES TO THE ALLEGED DEFICIENCIES

Defendants argue that they were only required to "remove architectural barriers

. . . if such removal [was] 'readily achievable.'" (Def. Br. (Dkt. No. 78) at 24) Plaintiff contends

that Defendants' modifications to the building had to be made "readily accessible and usable by

individuals with disabilities to the maximum extent feasible." (Pltf. Br. (Dkt. No. 80) at 23)

---

[10] Plaintiff makes a passing reference to "factual disputes as to the measurements and requirements of the dressing room [that make] this issue inappropriate for summary judgment." (Pltf. Br. (Dkt. No. 80) at 29) Plaintiff has not identified the alleged factual disputes, however, and they are not apparent from the parties' Local Rule 56.1 Statements. (See Def. R. 56.1 Stmt. (Dkt. No. 79); Pltf. R. 56.1 Stmt. (Dkt. No. 81)) Moreover, Plaintiff represented to the Court that she was only contesting one deficiency involving the dressing room – the lack of an ISA sign. (Apr. 23, 2015 Pltf. Ltr. (Dkt. No. 66) at 3)

19

## A.     Applicable Law

"[A] separate set of requirements . . . apply to so-called 'new construction' –

defined as a building designed for first occupancy beginning January 26, 1993 or later – and also

to existing buildings that undergo 'alterations.'" de la Rosa v. 597 Broadway Dev. Corp., No.

13CV7999 (LAK) (MHD), 2015 WL 7351540, at *6 (S.D.N.Y. Aug. 4, 2015), report and

recommendation adopted in part, 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015). "If alterations

have been made [to an existing facility], a defendant 'discriminates' if those altered areas . . . are

not made readily accessible to disabled individuals 'to the maximum extent feasible.'" Roberts

v. Royal Atl. Corp., 542 F.3d 363, 369 (2d Cir. 2008) (quoting 42 U.S.C. § 12183(a)(2)). "The

determination whether a facility has undergone an 'alteration' involves a fact-specific inquiry

centered on a broad application of the concept of 'usability.'" de la Rosa, 2015 WL 7351540, at

*7. Usability is to be "'read broadly to include any change that affects the usability of the

facility, not simply changes that relate directly to access by individuals with disabilities.'"

Roberts, 542 F.3d at 369 (quoting Nondiscrimination on the Basis of Disability by Public

Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544, 35,581 (July 26, 1991)).

The Second Circuit has outlined a non-exhaustive list of factors to consider in

evaluating whether an alteration has been made:

1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof.

2. The scope of the modification (including what portion of the facility or relevant part thereof was modified).

3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility).

4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.

20

Id. at 370 & n.5.

The plaintiff has the burden of production to establish an alteration. "[A] plaintiff fulfills . . . her initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration . . . . The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration." Roberts, 542 F.3d at 371. If the modification is deemed an alteration, a similar burden-shifting framework applies to the next step of the analysis:

> once a plaintiff has met an initial burden of production identifying some manner in which the alteration could be, or could have been, made "readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs," the defendant then bears the burden of persuading the factfinder that the plaintiff's proposal would be "virtually impossible" in light of the "nature of the facility."

Id. at 372 (citing 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

"A determination that a facility has undergone an 'alteration' has considerable significance with respect to the substance of the applicable legal standard. If the facility predated 1993 and has not undergone an alteration, the test is whether a proposed remedial step is readily achievable." de la Rosa, 2015 WL 7351540, at *7. "The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). "In order to make a prima facie showing that [barrier] removal is readily achievable, a plaintiff must 'articulate a plausible proposal for barrier removal, "the costs of which, facially, do not clearly exceed its benefits."'" Kreisler v. Second Ave. Diner Corp., No. 10 Civ. 7592(RJS), 2012 WL 3961304, at *7 (S.D.N.Y. Sept. 11, 2012), aff'd, 731 F.3d 184 (2d Cir. 2013) (quoting Roberts, 542 F.3d at 373). "Neither the estimates nor the proposal are required to be exact or detailed, for the defendant may counter the plaintiff's showing by meeting its own

21

burden of persuasion and establishing that the costs of a plaintiff's proposal would in fact exceed

the benefits." Roberts, 542 F.3d at 373. "Once the plaintiff meets its burden, the burden shifts to

the defendant to 'establish[] that the costs of a plaintiff's proposal would in fact exceed the

benefits.'" Kreisler, 2012 WL 3961304, at *7.

### B.   Analysis

Defendants contend that "[t]he readily achievable standard applies to Alleged

Deficiencies 1-4 because they have not been altered in a way 'that affects or could affect the

usability of the building or facility of any part thereof." (Def. Br. (Dkt. No. 78) at 25 (citing

Roberts, 542 F.3d at 369)) Plaintiff contends that "the alteration standard applies to defendants'

obligations because, well after 1992, defendants substantially altered the front entrance and

elevators." (Pltf. Br. (Dkt. No. 80) at 22)

Defendants have carried out a substantial amount of work on 600 Broadway over

the last decade. Before Hollister's lease began, 600 Broadway Partners had "remov[ed] the

existing sidewalk, grillage or steel work" – including the entranceway to the building – "and had

it refurbished, reinstalled, with [a] new glass block installed within the steel work." (Smith Dep.

(Dkt. No. 79-6) 14:4-21) "In late 2007, Hollister began leasing the store with plans to

rehabilitate it into a Hollister retail store." (Pltf. R. 56.1 Stmt. (Dkt. No. 81) ¶ 3) Prior to

commencing work on the building, Defendants obtained a permit from the Landmarks

Commission for

> interior alterations . . . at the subcellar through the third floor levels, including the
> demolition and construction of non-bearing partitions and finishes; the removal of
> sections of floor slabs; the construction of stairs and an elevator shaft; structural
> work, relating to the removal of sections of the floor slabs and construction of
> stairs and [an] elevator shaft; and mechanical and plumbing work.

22

(Parker Decl. (Dkt. No. 81-2), Ex. G (Landmarks Commission Permit) at 2)  While carrying out

work on the interior of the building, Defendants "refurbished the [historic] elevator and brought

it up to code to the fullest extent possible."  (Smith Decl. (Dkt. No. 79-2) ¶ 11)

   The evidence submitted concerning this work constitutes a "facially plausible

demonstration" of an alteration under the ADA.  Roberts, 542 F.3d at 371.  Although no

evidence regarding cost has been submitted, the scope of the work was substantial, and included

the demolition of multiple floors, the construction of stairs, the installation of an elevator, and

other structural work.  The work involved much more than mere maintenance, and went far

beyond the building's surface.  Defendants have not adduced contrary evidence sufficient to

meet their burden of persuasion.[11]  Accordingly, the Court finds that "[t]his work falls squarely

within the ADAAG's definition of alteration, which includes 'changes or rearrangement in

structural parts or elements.'"  Lemmons, 2014 WL 3107842, at *8.

   The Court must next consider whether the alterations were made "in such a

manner that, to the maximum extent feasible, the altered portions of the facility are readily

accessible to and usable by individuals with disabilities."  42 U.S.C § 12183(a)(2).  Deficiencies

1, 2, and 4 directly implicate Defendant's alterations.[12]  With regard to Deficiencies 1 and 2, the

sidewalk work resulted in "a slight slope with respect to the sidewalk leading up to the entrance,

and . . . a slight change in elevation when moving from the sidewalk [to] inside the Building."

(Smith Decl. (Dkt. No. 79-2) ¶ 9)  With regard to Deficiency 4, Defendants "refurbished" the

---

[11] Indeed, Defendants do not even address this issue in their reply.  (See Def. Reply (Dkt. No. 82))

[12] Given that the Court will grant Defendants' summary judgment motion as to Deficiency 3, the Court's analysis here is limited to Deficiencies 1, 2, and 4.

historic elevator, which "was not being fully utilized by the previous tenant," but did not bring it into compliance with the ADA. (Id. ¶ 11)

Plaintiff has met her burden of production by suggesting ways in which these deficiencies could be modified to permit greater accessibility. (See Apr. 23, 2015 Pltf. Ltr. (Dkt. No. 66) at 1-2; see also Parker Decl. (Dkt. No. 81-2), Ex. A (Pltf. Expert Rpt.) at 4-6) Defendants have not, however, met their burden of demonstrating that "accessibility [is] 'virtually impossible.'" Roberts, 542 F.3d at 372. Although Defendants assert that the sidewalk replacement was performed "within the parameters of [Landmarks Commission] approval," they have not presented any evidence that a more accessible option would have been outside of those parameters. (See Smith Decl. (Dkt. No. 79-2) ¶ 9) Defendants also note that further work on the historic elevator would "require [Landmarks Commission] approval," but it appears that they never sought such approval.[13] (See id. ¶ 12) Defendants complain that Plaintiff "fails to provide any evidence that the [Landmarks Commission] would approve of changes to the historic elevator." (Def. Br. (Dkt. No. 78) at 28) However, as "the party with the best access to information regarding the historical significance of the building," it is Defendants' burden to present such evidence. Molski v. Foley Estates Vineyard & Winery, LLC, 531 F.3d 1043, 1048 (9th Cir. 2008).

Because Defendants have not established that their alterations were made readily accessible and usable by individuals with disabilities to the "maximum extent feasible," their motion for summary judgment as to Deficiencies 1, 2, and 4 will be denied.

---

[13] Moreover, as noted above, this issue could have been avoided entirely if Defendants had always permitted customer use of the new ADA-compliant elevator.

24

## VII.   STATE AND CITY LAW CLAIMS

Defendants contend that Plaintiff's NYSCRL claim should be dismissed, because Plaintiff did not produce a copy of her Section 40-d notice during discovery. (Def. Reply (Dkt. 82) at 5) Section 40-d of the NYSCRL requires that "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general." N.Y. Civ. Rights Law § 40-d. This action was filed on September 11, 2013 (Cmplt. (Dkt. No. 1)), and Plaintiff served the Section 40-d notice on the New York State Attorney General that same day. (Parker Decl. (Dkt. No. 81-2), Ex. C (Section 40-d Notice))

Section 40-d requires that notice be served upon the New York State Attorney General, not upon defendants. Although Plaintiff should have produced the notice during discovery, her failure to do so is not grounds for dismissal.[14]

Defendants' summary judgment motion concerning Plaintiff's state and city law claims is granted only to the extent that their motion concerning Plaintiff's ADA claims is granted. The motion is otherwise denied.

---

[14] Defendants also contend that Plaintiff "conceded that she has no damages." (See Def. Br. (Dkt. No. 78) at 30) Plaintiff made no such concession. During her deposition, Plaintiff testified that she has not lost money or suffered physical injuries as a result of Defendants' conduct. (De La Rosa Dep. (Dkt. No. 81-6) 48:8-15) However, she also testified that it was "not the best feeling in the world not being able to have full access like everyone else," and that it "downgrade[d] [her] as a person" that she "couldn't shop the way everyone else did." (Id. 48:8-15, 51:4-17) Such allegations are sufficient to sustain an award of damages under New York law. See Kreisler, 2012 WL 3961304, at *15 ("Although Plaintiff has not established any particular damages other than that he feels discriminated against because he is unable to access the Diner, the Court finds that such harm warrants compensation.").

## CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part as set forth above. The Clerk of the Court is directed to terminate the motion (Dkt. No. 77).

The parties are directed to comply with the Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order will be filed on May 6, 2016. Motions in limine and pre-trial memoranda are due on May 6, 2016. Responsive papers, if any, are due on May 20, 2016. Trial will commence on July 11, 2016, at 9:30 a.m., in Courtroom 705, 40 Foley Square, New York, New York.

Dated: New York, New York
       March 3ᵘ, 2016                        SO ORDERED.

                                    Paul G. Gardephe
                                    United States District Judge

26